**[J-67A-2024 and J-67B-2024]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**

**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, McCAFFERY, JJ.**

| | |
|---|---|
| EASTERN STEEL CONSTRUCTORS, INC., | : No. 103 MAP 2023 |
| | : |
| Appellee | : Appeal from the order of the |
| | : Superior Court at No. 998 MDA |
| | : 2020, entered on September 1, |
| v. | : 2022, Affirming, Reversing and |
| | : Vacating in part the Judgment of the |
| | : Centre County Court of Common |
| INTERNATIONAL FIDELITY INSURANCE | : Pleas, Civil Division, at No. 2011- |
| COMPANY, | : 3233, entered on July 23, 2020 and |
| | : Remanding. |
| Appellant | : |
| | : ARGUED:  October 9, 2024 |

| | |
|---|---|
| EASTERN STEEL CONSTRUCTORS, INC., | : No. 104 MAP 2023 |
| | : |
| Cross Appellant | : Appeal from the Order of the |
| | : Superior Court at No. 998 MDA |
| | : 2020, entered on September 1, |
| v. | : 2022, Affirming, Reversing and |
| | : Vacating in Part the Judgment of the |
| | : Centre County Court of Common |
| INTERNATIONAL FIDELITY INSURANCE | : Pleas, Civil Division, at No. 2011- |
| COMPANY, | : 3233, entered on July 23, 2020 and |
| | : Remanding. |
| Appellee | : |
| | : ARGUED:  October 9, 2024 |

**OPINION**

**JUSTICE WECHT**[1]                                        **DECIDED:  February 18, 2026**

---

[1]      This opinion was reassigned to this author.

This appeal is the culmination of long and protracted litigation between Eastern Steel Constructors, Inc. ("Eastern"), and International Fidelity Insurance Company ("Fidelity") regarding Fidelity's obligations under a surety payment bond. Eastern asks us to decide whether Pennsylvania's insurance bad faith statute[2] applies to surety contracts issued by insurance companies. We conclude that it does not, based upon that statute's plain language. Section 8371 plainly does not apply to Eastern's suit against Fidelity because that statute applies only to "insurance policies" and actions of an "insurer." It does not apply to surety bonds or actions of a surety.

In its cross-appeal, Fidelity asks us to determine the extent to which Fidelity, as surety, is bound by an arbitration award against Ionadi Corporation, its principal, and the extent to which Fidelity is liable for certain attorneys' fees and prejudgment interest. We conclude that the arbitration award against Ionadi as principal is conclusive and binding upon Fidelity as surety. Fidelity agreed to be jointly and severally liable with Ionadi for all sums due to Eastern, and had notice and opportunity to participate in the arbitration proceedings. We further conclude that Eastern may recover, as part of all sums due, attorneys' fees incurred in connection with pursuing Ionadi in arbitration, as well as prejudgment interest at the statutory rate of 6% per annum.[3] We affirm the Superior Court's decision in all respects.

## I. Background

In 2008, the Pennsylvania State University ("PSU") entered into a construction contract with Ionadi Corporation to erect steel for the construction of the Millenium Science Center Complex on campus ("Project"). To secure Ionadi's solvency, Fidelity issued a surety bond in the amount of $10.125 million. The payment bond identified

---

[2]     42 Pa.C.S. § 8371.

[3]     41 P.S. § 202.

Fidelity as "Surety," Ionadi as "Contractor" and "Contractor as Principal," and PSU as "Owner" relative to the Project.[4]

Section 1 of the payment bond provided that Ionadi and Fidelity "jointly and severally" bind themselves as follows:

> 1. The Contractor and the Surety, jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to the Owner to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract, which is incorporated herein by reference.[5]

The payment bond also provided for Ionadi's and Fidelity's liability to subcontractors, which the payment bond called "Claimants."[6] Sections 2 and 3 obligated Fidelity and Ionadi, jointly and severally, to pay "all sums due" to Claimants as follows:

> 2. With respect to Owner, the obligation shall be null and void if the Contractor:
>
> > 2.1 Promptly makes payment, directly or indirectly, for all sums due Claimants. . . .
>
> 3. With respect to Claimants, this obligation shall be null and void if the Contractor promptly makes payment, directly or indirectly, for all sums due.[7]

These provisions embodied the intent of Ionadi and Fidelity that Ionadi would enter into subcontracts with subcontractors to complete the construction project and that, if Ionadi was unable to pay the subcontractors, Fidelity would be there to ensure that those subcontractors received "all sums due." This is the purpose of a surety payment bond:

---

[4]     Payment Bond, 10/29/08, at 4; Reproduced Record ("R.R.") at 34a.

[5]     Payment Bond, 10/29/08, at 5, ¶ 1; R.R. at 35a.

[6]     The Payment Bond defined "Claimant" as "[a]n individual or entity having a direct contract with [Ionadi] or with a subcontractor of [Ionadi] to furnish labor, materials or equipment for use in the performance of the [Construction] Contract." *Id*. at ¶ 15; R.R. 36a.

[7]     *Id*. at ¶¶ 2, 2.1, 3; R.R. at 35a.

to protect against the risk that the principal becomes insolvent and unable to meet its financial commitments.

In Section 11, the payment bond provided that "[n]o suit or action shall be commenced by a Claimant under this Bond other than in a court of competent jurisdiction in the location in which the work or part of the work is located or after the expiration of one year from the date" on which the Claimant gave notice to Fidelity as required by the payment bond, or on which the last of the obligations was performed under the Construction Contract, whichever comes first.[8]

After Fidelity issued the payment bond, Ionadi subcontracted with Eastern for installation services for steel reinforcing material ("Subcontract"). The Subcontract provided, in relevant part, that Eastern reserved the right to charge interest on late payments at 1.5% monthly, that Eastern "shall be considered a direct obligee of [Ionadi's] bond assuring" the Subcontract, and that "[a]ny costs incurred, direct and indirect, for which [Eastern] is subjected in pursuing any money, or consequential damages, legal fees, and costs of any kind to [Eastern] for nonperformance [ ] will be . . . [Ionadi's] and its surities [*sic*] responsibility."[9] The Subcontract also provided that disputes would be resolved through arbitration with the American Arbitration Association ("AAA").[10] Eastern entered into a subcontract with Tinney Rebar Services, Inc., for the fabrication and supply of reinforcing steel material. That subcontract also had a clause requiring arbitration through AAA.

Eastern worked on the project from February 2009 through September 2010. During this time, Eastern submitted monthly invoices to Ionadi for payment in accord with

---

[8] *Id.* ¶ 11; R.R. at 35a.

[9] Subcontract, 11/11/08, at 3, ¶ 23; R.R at 39a.

[10] *Id*. at 3, ¶ 25; R.R. at 39a.

the Subcontract, which Ionadi paid for the first five months. After five months, Ionadi began to default on payments, explaining to Eastern that Ionadi was having cash flow problems. In April 2010, while work on the project was ongoing, Eastern notified Fidelity that it was making a claim as a subcontractor under the Payment Bond for $622,182.90, the amount it claimed it was owed by Ionadi. Fidelity made partial payment, tendering the amount it did not dispute.[11] After receiving this partial payment, Eastern claimed that Ionadi still owned $253,788.08 under the Subcontract, exclusive of interest, attorneys' fees, costs, expenses, and penalties.

Because Fidelity's partial payment had not made Eastern whole, Eastern abided by the terms of its Subcontract with Ionadi and, on November 29, 2010, filed a demand for binding arbitration against Ionadi. Tinney, Eastern's subcontractor, also sought arbitration. Tinney's arbitration was consolidated with Eastern's arbitration proceeding.[12] Although Eastern and Tinney notified Fidelity of the arbitration proceedings, Fidelity declined to participate. When arbitration began in October 2011, Ionadi promptly filed for bankruptcy. The arbitrator suspended proceedings pending the efforts of Tinney and Eastern to lift the automatic bankruptcy stay, which halted all arbitration efforts against

---

[11] The payment bond provided that Fidelity had no obligation to Claimants unless and until Claimants followed the procedure for making a claim as outlined in the payment bond. In Section 4.1, Claimants were required to provide notice of the claim to Fidelity. Payment Bond, 10/29/08, at 5, ¶ 4.1; R.R. at 35a. Fidelity was then obligated to pay any undisputed amounts and provide a basis for disputing the remaining amounts. *Id*. at 5, ¶¶ 6.1, 6.2; R.R. at 35a. If Fidelity failed to abide by these provisions, then Fidelity agreed to indemnify the Claimant "for the reasonable attorney's fees the Claimant incurs to recover any sums found to be due and owing to the Claimant." *Id*. at 6, ¶ 6.3; R.R. at 36a.

[12] Although Tinney's subcontract with Ionadi contained an arbitration clause, Tinney initially filed a civil suit against Ionadi and Fidelity in the Court of Common Pleas of Allegheny County. The court ultimately dismissed Tinney's suit on preliminary objections on the grounds that, *inter alia,* Tinney's claims against Ionadi were subject to arbitration. Tinney filed an arbitration demand against Ionadi and later sought to join Eastern's arbitration proceedings against Ionadi. Eastern and Tinney agreed to consolidation.

Ionadi.[13]  Fidelity did not participate in litigation before the bankruptcy court, which ultimately lifted the stay, allowing the arbitration to proceed.

In arbitration, Ionadi did not defend itself.  Despite continual notice, Fidelity likewise declined to participate.  After Eastern and Tinney presented their cases, the arbitrator awarded Eastern $433,489.42.  This included the amount that Eastern claimed it was owed for unpaid work ($253,788.08), plus interest and penalties on unpaid or untimely paid amounts due under the Subcontract as well as Pennsylvania's Contractor and Subcontractor Payment Act (CASPA)[14] ($68,299.08), and attorneys' fees ($111,404.62).  The arbitrator additionally directed Ionadi to reimburse Eastern $19,933.43 for arbitration fees and expenses.  Throughout the arbitration proceedings, Eastern repeatedly notified Fidelity of the proceedings and invited Fidelity's participation through various letters and communications.  Fidelity did not accept any of these invitations or otherwise seek to intervene in arbitration.  Although the award was entered against Ionadi, Fidelity had agreed to be jointly and severally liable with Ionadi under the Payment Bond for "all sums due" Claimants.  Despite this joint and several liability, neither Ionadi nor Fidelity sought to vacate the arbitration award.

Upon Eastern's motion, the bankruptcy court lifted the bankruptcy stay to allow Eastern to petition for confirmation of the arbitration award.  Fidelity attended the hearing in bankruptcy court and did not object to Eastern's motion.  In July 2012, the Allegheny County Court of Common Pleas confirmed the arbitration award and entered judgment in favor of Eastern and against Ionadi.[15]  Fidelity attended these proceedings as well, yet it

---

[13]    *See generally* 1 U.S.C. § 362(d) (authorizing bankruptcy court to grant relief from automatic stay on request of party in interest and following notice and hearing).

[14]    73 P.S. §§ 501-517.

[15]    *See* 42 Pa.C.S. § 7342(b) ("On application of a party made more than 30 days after an award is made by an arbitrator under Section 7341 [of the Uniform Arbitration (continued…)

again lodged no objection. Neither Ionadi nor Fidelity appealed the judgment confirming the arbitration award.

Although the arbitration award was entered against Ionadi, Ionadi and Fidelity had agreed to stand jointly and severally liable under the payment bond for "all sums due" Claimants. Accordingly, Eastern attempted to collect the judgment from Fidelity. Fidelity refused to pay. In accordance with the forum clause of the payment bond, in August 2011, Eastern commenced suit against Fidelity in the Centre County Court of Common Pleas asserting, *inter alia,* claims to enforce the arbitration award against Fidelity, to collect attorneys' fees and interest from Fidelity under the Subcontract and the payment bond, and to recover damages against Fidelity under a claim for insurance bad faith.[16] Eastern ultimately asserted eight causes of action in an amended complaint.[17] Fidelity filed preliminary objections to the complaint, which the trial court overruled. Fidelity filed an answer and new matter, to which Eastern filed a reply.

Fidelity moved for partial judgment on the pleadings, seeking dismissal of Counts 5 through 7 on the grounds that Fidelity was not bound by the arbitration award and judgment against Ionadi because Fidelity was not a party to the Subcontract that contained the AAA arbitration clause, was not a party to the arbitration proceedings, and did not participate therein. Fidelity also asserted that Eastern's insurance bad faith claim under Section 8371 was not cognizable against a surety. Eastern moved for partial

---

Act] (relating to common law arbitration), the court shall enter an order confirming the award and shall enter a judgment or decree in conformity with the order.").

[16]  42 Pa.C.S. § 8371.

[17]  Eastern asserted the following claims: (1) breach of contract; (2) breach of contract (third party beneficiary); (3) action in assumpsit/civil action under the Public Works Contractors' Bond Law of 1967, 8 P.S. §§ 191-202; (4) indemnification; (5) breach of contract (enforcement of arbitration award); (6) action in assumpsit/civil action under the Bond Law (enforcement of arbitration award); (7) insurance bad faith under Section 8371 of the Judicial Code; and (8) promissory estoppel.

summary judgment with respect to Counts 1, 2, 3, 6, and 7 premised upon its contention that Fidelity was indeed bound by the arbitration award.

The trial court denied Fidelity's motion with respect to Counts 5 through 7, reasoning that Fidelity was bound by the arbitration award and that the award was at least *prima facie* evidence against Fidelity. The trial court further reasoned that Eastern's bad faith claim was cognizable against a surety, and that Eastern's claims required further litigation. The trial court also denied Eastern summary judgment, concluding that the arbitration award was not necessarily conclusive of Fidelity's liability.

Fidelity later filed a motion *in limine* to exclude evidence of the arbitration award at trial. In an apparent change of course, the trial court granted the motion, excluding evidence of the arbitration award and the resulting judgment. The trial court opined that Fidelity was not contractually bound to participate in the arbitration proceeding and that it was unjust to use the award as evidence against it.

After an initial mistrial, Fidelity moved for partial summary judgment as to Count 4 of the amended complaint (the indemnification claim), under which Eastern sought to recover attorneys' fees and costs under the Subcontract and payment bond, and Count 7 (the bad faith claim). The trial court granted this motion, concluding that Fidelity was not liable for attorneys' fees under the Subcontract and that Eastern was entitled to no attorneys' fees or costs under the payment bond because Fidelity had satisfied its obligations under the payment bond in responding to Eastern's claims. The trial court also concluded that Section 8371 of the Judicial Code was not intended to encompass bad faith claims arising from a surety bond, and Eastern could not succeed on its insurance bad faith claim.

On February 24, 2020, the case proceeded to a jury trial. At the close of evidence, and without objection, the trial court instructed the jury on the nature of suretyship, as follows:

> In this case, [Ionadi] and [Fidelity] are separate legal entities who entered into a surety contract. A surety contract is a direct and original undertaking under which the surety provider, [Fidelity], is primarily and jointly liable with the principal, Ionadi. The liability of [Fidelity] as surety is coextensive with that of Ionadi as principal. And accordingly, the surety, [Fidelity], is bound to perform whatever may be legally required of its principal, Ionadi.[18]

The jury returned a verdict in Eastern's favor for $253,788.06—the amount claimed under the Subcontract and awarded in arbitration. Seeking post-trial relief, Eastern sought to mold the verdict to include prejudgment interest in the amount of 1.5% per month, which was the amount provided in its Subcontract with Ionadi. The trial court instead applied the statutory prejudgment interest rate of 6% per year, calculated from May 5, 2010 (when Eastern initially requested payment from Fidelity) through May 28, 2015 (the date of the mistrial).[19] Adding the prejudgment interest to the jury's damage award resulted in a verdict of $330,427.70, which was reduced to judgment in Eastern's favor.

Eastern and Fidelity cross-appealed to the Superior Court. The Superior Court consolidated the appeals and affirmed in part, reversed in part, vacated in part, and remanded for further proceedings.[20] The Superior Court first addressed the effect of the arbitration award on Fidelity as surety. The Superior Court agreed with Eastern that the

---

[18] Notes of Testimony ("N.T.") Trial, 2/24/2020, at 201 (jury instructions); R.R. at 2770a.

[19] *See* 41 P.S. § 202 (providing that the default contractual rate of interest is "six per cent per annum").

[20] *Eastern Steel Constructors, Inc., v. Int'l Fid. Ins. Co.*, 282 A.3d 827 (Pa. Super. 2022).

trial court erred in excluding evidence of the arbitration award and the resulting judgment. The Superior Court ruled that the award was conclusive and enforceable against Fidelity. Examining the language of the payment bond, the Superior Court observed that Fidelity and Ionadi jointly and severally bound themselves to PSU for all labor, materials, and equipment furnished under the construction contract. The obligation to make payment under the payment bond was null and void only if Ionadi made payment to Claimants for "all sums due."

The Superior Court reasoned that the amount of "all sums due" is determined under the Subcontract, which confirmed that Eastern was a direct obligee of Ionadi's payment bond and that disputes between Eastern and Ionadi would be resolved through binding arbitration. According to the Superior Court, the arbitration award was enforceable against Fidelity and should be given binding and conclusive effect in Eastern's litigation against Fidelity. In reaching this conclusion, the Superior Court relied principally upon this Court's decision in *Conneaut Lake Agricultural Association v. Pittsburg Surety Company*.[21]

The Superior Court rejected Fidelity's argument that the arbitration award was unenforceable against it because it included interest, penalties, attorneys' fees, and arbitration costs. The Superior Court held that, under the payment bond, Fidelity was obligated to pay "all sums due" to Claimants. "All sums due," in turn, incorporated the Subcontract, which specifically provided for a particular interest calculation, attorneys' fees, and costs. The Superior Court held that Fidelity was bound by the entire arbitration award. Although Eastern could recover attorneys' fees under the Subcontract for

---

[21]    74 A. 620 (Pa. 1909) (holding that an arbitrator's award, rendered after the surety and principal were notified of the time and place of the arbitration proceeding and chose not to appear and defend, was conclusive and binding upon the surety in a subsequent action).

expenses incurred in seeking recovery against Ionadi (which, in turn, was part of the "all sums due" to Eastern under the payment bond), the Superior Court held that Eastern could not recover attorneys' fees in connection with its lawsuit against Fidelity in the trial court because attorneys' fees were not guaranteed under the payment bond. For support, the Superior Court relied upon *Commonwealth to Use of Fort Pitt Bridge Works v. Continental Casualty Company.*[22]

Eastern argued that it was entitled to prejudgment interest at the rate of 1.5% per month provided in the Subcontract. Consistent with its rationale on the question of attorneys' fees, the Superior Court noted that the interest rate provided in the Subcontract is part of the determination of what Ionadi owed to Eastern, but not part of the calculation of the interest due to Eastern for collection of its arbitration award against Fidelity (as confirmed by the trial court) for Fidelity's breach of its surety obligations. Because the payment bond did not provide for an alternative interest rate, the Superior Court held that the trial court correctly applied the statutory rate of 6% per year.[23]

Finally, the Superior Court affirmed the trial court's order granting Fidelity's motion for partial summary judgment as to Eastern's insurance bad faith claim. Noting that the applicability of the insurance bad faith statute to sureties was a question of first impression, the Superior Court held that Section 8371 did not apply to sureties. The

---

[22] 240 A.2d 493, 494-95 (Pa. 1968) (holding that a surety was required to pay interest pursuant to bond at issue, which did not expressly mention interest but required the surety to pay "sums justly due").

[23] The Superior Court disagreed with the trial court concerning the dates applicable to the interest calculation. The trial court awarded interest from the date that Eastern submitted its request for payment to Fidelity, whereas the Superior Court held that interest should be calculated from the time that payment was due as a matter of right. The Superior Court accordingly vacated the trial court's award of prejudgment interest and remanded for recalculation of the correct amount.

Superior Court relied upon the "ordinary meaning"[24] of the statutory terms and precedent from the Supreme Court of the United States, this Court, and the Commonwealth Court to conclude that there are fundamental differences between insurance and surety contracts. For instance, although insurance contracts are bilateral contracts between the insurer and the insured, suretyship contracts are tripartite in nature and involve the surety agreeing on behalf of the principal to make whole a protected party for debts incurred by that party.[25] The Superior Court reasoned that, if the General Assembly intended to include suretyship in the insurance bad faith statute, it would have included language to this effect.

## II. Issues

Fidelity and Eastern filed cross-petitions for allowance of appeal, which this Court granted, in part. In Eastern's appeal, we must determine "[w]hether Pennsylvania's insurance bad faith statute, 42 Pa.C.S. § 8371, applies to surety contracts/policies issued by insurance companies."[26] In Fidelity's appeal, we accepted review to decide two issues. The first issue asks "[w]hether a surety is bound by a default judgment entered in an arbitration to which the surety was not a party and despite a provision in the bond specifying that litigation against the surety will proceed in a court of law."[27] Second, we are tasked with deciding "[w]hether a surety is liable for attorneys' fees and/or contractual interest under the terms of a payment bond that covers only labor, materials and

---

[24] *Eastern Steel*, 282 A.3d at 861 ("[W]e must determine and apply [the] ordinary meaning [of "insurance policy"] and decide whether the meaning is unambiguous and subsumes surety contracts.").

[25] *Eastern Steel*, 282 A.3d at 862.

[26] *Eastern Steel Constructors, Inc., v. Int'l Fid. Ins. Co.*, 307 A.3d 610, 611 (Pa. 2023) (*per curiam*).

[27] *Id.*

equipment."[28]  These issues present questions of law.  Our standard of review is *de novo* and our scope of review is plenary.[29]

## III. Discussion

## A. Bad Faith Statute

Eastern's appeal involves the bad faith statute, Section 8371 of the Judicial Code.[30]  Section 8371 provides that, "[i]n an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may" impose an increased interest rate on a damage award, award punitive damages, and assess attorneys' fees and costs.[31]  Eastern acknowledges that the statute applies to bad faith actions of "insurers" with regard to "an insurance policy."  Eastern argues that this language includes surety bonds.

Eastern provides a historical analysis of suretyship starting with Hammurabi's Code and a Mesopotamian tablet from 2750 B.C.E., through the development of corporate surety practice in the mid-19th century.  In addition to this history, Eastern contends that the plain language of the statute supports its position.  Nonetheless, Eastern further invokes various judicial decisions, scholarly sources, and statutory construction principles, which purportedly suggest that suretyship is a form of insurance relationship.  Eastern rejects the Superior Court's distinction between "bilateral" insurance agreements and "tripartite" surety arrangements.  The relationships between the parties, Eastern argues, do not change the duty of the surety provider to pay the protected party for specified losses.  A claimant under a surety bond remains an intended beneficiary of

---

[28]     *Id*. at 610-11.

[29]     *Commonwealth v. Bortz*, 909 A.2d 1221, 1223 (Pa. 2006).

[30]     42 Pa.C.S. § 8371.

[31]     *Id.*

the surety provider's undertaking, which, Eastern contends, is essentially an insurance relationship. Eastern further disputes the Superior Court's "ordinary meaning" approach to understanding the term "insurance policy" in Section 8371, arguing that dictionary definitions of "insurance," "bond," and "surety" all suggest that surety may be viewed as a synonym for "insurance."

Eastern next makes an *in pari materia* argument,[32] noting that the General Assembly has specified that "insurance" includes "surety," particularly in the Unfair Insurance Practices Act.[33] Eastern urges the Court to construe the bad faith statute alongside the UIPA, and to consider definitions from the UIPA to find that "insurance policy" includes "suretyship" for purposes of the bad faith statute.

Eastern accuses Fidelity of engaging in precisely the sort of bad-faith conduct that Section 8371 was intended to prohibit, in that it deliberately refused to make Eastern whole for its economic losses caused by Fidelity's principal, and Eastern thus has been forced to spend exorbitant sums on attorneys' fees and costs to pursue what it is owed. The purpose of the punitive damages authorized by the bad faith statute, Eastern argues, is to punish an insurer for acting beyond the scope of its contract to thwart an insured's effort to recover for a loss. According to Eastern, this is exactly what Fidelity has done, and its conduct should be treated similarly to any other insurer who acts in bad faith.

In response, Fidelity emphasizes that the plain language of Section 8371 says nothing about suretyship, but rather applies to "an insurance policy," the "insurer," and

---

[32]     *See* 1 Pa.C.S. § 1932(a) (instructing courts to view statutes "*in pari materia* when they relate to the same persons or things or to the same class of persons or things").

[33]     40 P.S. §§ 1171.1-1171.15. Section 3 of the UIPA defines "insurance policy" as "any contract of insurance, indemnity, health care, suretyship, title insurance, or annuity issued, proposed for issuance or intended for issuance by any person." 40 P.S. § 1171.3.

the "insured." Because the statute is penal in nature (due to the availability of punitive damages), Fidelity stresses that Section 8371 must be strictly construed.

Fidelity argues that, thirty years before the enactment of Section 8371, the Supreme Court of the United States stated that the "usual view, grounded in commercial practice, [is] that suretyship is not insurance."[34] Indeed, Fidelity contends that, ever since Section 8371 was enacted in 1990, federal and state courts in Pennsylvania have concluded that surety bonds are not insurance policies.[35]

Fidelity turns to the view of both courts and treatises suggesting that surety bonds have numerous, significant differences from insurance policies: the surety has contractual relationships with multiple parties who may have conflicting interests, not just a single insured; the bond is a financial credit product, not an insurance product; the premium is not based upon risk of loss but upon the financial obligations of the principal; the bond is often written by the obligee rather than the surety; surety bonds are typically for major construction projects between sophisticated parties of equal bargaining power; and the bond premium is usually paid to the surety out of the contract price, rather than out of the obligee's pocket.

Fidelity also endorses the Superior Court's shorthand that insurance agreements are "bilateral," whereas surety is a "tripartite" relationship, because surety presents a more complex arrangement with obligations to multiple parties, not just to the "insured." Suretyship is further distinct, Fidelity argues, because the surety has a right to be indemnified by its principal. Insurance, by contrast, is purely an assumption of risk on the

---

[34]     *Pearlman v. Reliance Ins. Co*, 371 U.S. 132, 140 n.19 (1962).

[35]     *See, e.g.*, *Pullman Power Prods. Corp. v. Fidelity & Guaranty Ins. Co.,* 1997 WL 33425288, at *4 (W.D. Pa. 1997) ("Section 8371 is plain and unambiguous on its face in that it applies to insurance policies only. The ordinary meaning of insurance policies does not include surety bonds.").

part of the insurer, where it will be solely responsible in the event of a specified loss. Because a surety does not agree to bear the principal's loss (but rather makes itself jointly liable for the principal's debt until it can recover its costs from the principal), Fidelity calls suretyship a credit accommodation rather than insurance. For this reason, Fidelity asserts, surety bond premiums are typically far lower than insurance premiums.

All of Eastern's precedents, according to Fidelity, are very old and inconsistent with the modern understanding that surety and insurance are distinct. As for Eastern's *in pari materia* argument, Fidelity counters that we should assume that, where the General Assembly provided a specific definition that would include suretyship in other statutes (*i.e.*, the UPIA), the omission of the same in Section 8371 was intentional. According to Fidelity, if the General Assembly had intended Section 8371 to apply to suretyship, it could and would have said so expressly.

Fidelity argues that there is no policy interest that would be served by punishing surety providers, and they don't need the threat of punitive damages to be "incentivized" to comply with their obligations. Otherwise, Fidelity argues, all contract suits should result in punitive damage awards. But punitive damages generally are unavailable in contract disputes, and Fidelity sees no reason to conclude differently here.

Because this issue requires us to engage in statutory construction, we begin with the Statutory Construction Act.[36] The object of all statutory interpretation "is to ascertain and effectuate the intention of the General Assembly. Every statute shall be construed, if possible, to give effect to all its provisions."[37] The plain language of a statute "provides the best indication of legislative intent."[38] If the statutory language is "clear and free from

---

[36]    1 Pa.C.S. § 1501-1991.

[37]    *Id*. § 1921(a).

[38]    *Miller v. Cnty. of Centre*, 173 A.3d 1162, 1168 (Pa. 2017).

all ambiguity," then we cannot disregard the letter of it "under the pretext of pursuing its spirit."[39]  When examining a statute, we are bound by its plain language; accordingly, "we should not insert words into the Act that are plainly not there."[40]  When a statute is ambiguous, the Statutory Construction Act directs us to consider various factors in order to ascertain the intent of the General Assembly.[41]

Section 8371 provides as follows:

In an action arising under an insurance policy, if the court finds that the insurer has acted in bad faith toward the insured, the court may take all of the following actions:

(1) Award interest on the amount of the claim from the date the claim was made by the insured in an amount equal to the prime rate of interest plus 3%.

(2) Award punitive damages against the insurer.

(3) Assess court costs and attorney fees against the insurer.[42]

Section 8371 does not define "insurance policy."  Neither the Judicial Code nor the Statutory Construction Act defines "insurance policy," "insurer," or "insured."  Looking at the ordinary meaning of these terms, an "insurance policy" generally is defined as "[a] contract of insurance, including the insured's application, the declarations page, the coverage forms, and any endorsements or riders that amend them."[43]  An "insurer" is "[o]ne who underwrites insurance policies and issues them to insureds; esp., a company or association that undertakes to indemnify against losses and to perform other

---

[39]     1 Pa.C.S. § 1921(b).

[40]     *Frazier v. W.C.A.B. (Bayada Nurses, Inc.),* 52 A.3d 241, 245 (Pa. 2012).

[41]     1 Pa.C.S. § 1921(c).

[42]     42 Pa.C.S. § 8371.

[43]     *Insurance Policy*, BLACK'S LAW DICTIONARY (12th ed. 2024).

insurance-related functions."[44]  And "insured" is defined as "[t]he person or entity that is covered or protected by an insurance policy; the person or entity whose insurable interest is protected by a contract with an insurer."[45]

In contrast, a "payment bond," which is the type of surety bond at issue in this case, is "[a] bond given by a surety to cover any amounts that, because of the general contractor's default, are not paid to a subcontractor or materials supplier."[46]  A "surety" is "[s]omeone who is primarily liable for paying another's debt or performing another's obligation."[47]  A "suretyship" is "[t]he legal relation that arises when one party assumes liability for a debt, default, or other failing of a second party."[48]  Black's Law Dictionary defines "surety bond" by equating it to a "performance bond," which is "[a] bond given by a surety to ensure the timely performance of a contract" and "[a] third party's agreement to guarantee the completion of a construction contract upon the default of the general contractor."[49]

Consistent with these dictionary definitions, this Court previously has endorsed the understanding of suretyship expressed by the Supreme Court of the United States: "the

---

[44]     *Insurer*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[45]     *Insured*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Insured*, Meriam-Webster, https://www.merriam-webster.com/dictionary/insured (last viewed September 3, 2025) (defining "insured" as "a person whose life or property is insured").

[46]     *Bond*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[47]     *Surety*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Surety*, Meriam-Webster, https://www.merriam-webster.com/dictionary/surety (last viewed September 3, 2025) (defining "surety" to mean, in part, "one who has become legally liable for the debt, default, or failure in duty of another").

[48]     *Suretyship*, BLACK'S LAW DICTIONARY (12th ed. 2024).

[49]     *Performance Bond*, BLACK'S LAW DICTIONARY (12th ed. 2024); *see also Surety Bond*, Meriam-Webster, https://www.merriam-webster.com/dictionary/surety%20bond (last viewed September 3, 2025) (defining "surety bond" as "a bond guaranteeing performance of a contract or obligation").

usual view, grounded in commercial practice, [is] that suretyship is not insurance."[50] Section 8371 clearly and unambiguously does not encompass a surety bond. Insurance and surety bonds are terms that have their own distinct definitions, and in practice operate in distinct ways, as Fidelity argues. Insurance is intended to protect the party to the contract (the insured), whereas suretyship is intended to protect *others* from the default of the party to the contract (the principal). Moreover, as Fidelity notes, there is no risk of loss for a surety because the surety has a right of indemnification against its principal.

With both insurance and surety bonds, there is a shifting of risk in exchange for a premium. This similarity has sometimes prompted courts as well as secondary sources to equate the two. Our present task, however, is one of statutory interpretation. The language of the bad faith statute is clear, unambiguous, and controlling. The General Assembly did not intend to subject surety bonds to the bad faith statute.

We are not persuaded by Eastern's *in pari materia* arguments premised upon other statutes, including the UIPA. Under the statutory construction rule of *expressio unius*,[51] we observe that the General Assembly chose not to define "insurance policy" in the bad faith statute, while providing a statutory definition in the UIPA and other statutory provisions that include or exclude suretyships. The explicit inclusion of suretyship within the UIPA, for instance, implies the exclusion of the term from the bad faith statute. As the Superior Court observed, had the General Assembly intended to create a private cause of action for bad faith claims arising from surety bonds, it could have done so expressly. The plain language of the statute reflects no such intent.

---

[50] *Foster v. Mut. Fire, Marine & Inland Ins. Co.,* 614 A.2d 1086, 1099 (Pa. 1992) (quoting *Pearlman*, 371 U.S. at 140 n.19).

[51] *Thompson v. Thompson*, 223 A.3d 1272, 1277 (Pa. 2020) ("Under the doctrine of *expressio unius est exclusio alterius*, 'the inclusion of a specific matter in a statute implies the exclusion of other matters.'") (internal citation omitted).

We likewise reject Eastern's policy-based arguments. "Invocations of, and arguments about, public policy cannot override the plain language of" the statute or "contravene the plain meaning of the term" used therein.[52] Section 8371 applies to "insurance policies." It does not apply to suretyship. Eastern is not entitled to relief on its cross-appeal.

## B. The Arbitration Award

Fidelity argues that the Superior Court erred in deeming that Fidelity was bound by the "default" arbitration award against Ionadi even though: (1) Fidelity was not a party to any arbitration agreement or to the Subcontract; (2) that Eastern purportedly "precluded" Fidelity from joining the arbitration by seeking to force it to agree to onerous "extra conditions;" and (3) the payment bond specified that actions against Fidelity must proceed in a court of competent jurisdiction. Fidelity argues that, under these circumstances, it was unjust to deem the arbitration award "binding and conclusive" against it when, it claims, it lacked a sufficient opportunity to defend itself.

Fidelity challenges the Superior Court's reliance upon this Court's decision in *Conneaut Lake* for the proposition that a surety is bound by an arbitration award against its principal if it had notice and an opportunity to defend itself. This precedent, according to Fidelity, is old; is distinguishable because it concerns a performance bond, which typically incorporates the underlying bonded contract by reference, rather than a payment bond; and has never again been cited for this proposition.

Fidelity claims that it cannot be bound by the arbitration award because it was effectively a default judgment against Ionadi, which failed to defend itself. As such, Fidelity claims that there has been no decision on the merits sufficient to trigger any kind

---

[52] *Barnard v. Travelers Home & Marine Ins. Co.,* 216 A.3d 1045, 1054 (Pa. 2019).

of claim preclusion, particularly where no one represented Fidelity's interests during the arbitration.

Fidelity claims that it is Eastern's fault that it did not participate in the arbitration proceedings, because Eastern placed onerous conditions upon its attendance, including forcing Fidelity to waive the payment bond's forum provision, waive its defenses against Eastern's bad faith claim, and agree to written discovery and depositions. Fidelity stresses that the trial court concluded that these conditions deprived Fidelity of an opportunity to participate in the arbitration. According to Fidelity, if Eastern intended to bind Fidelity in its arbitration, "then Eastern would have allowed [Fidelity] to intervene unconditionally."[53] Enforcing the arbitration award "would permit a subcontractor, like Eastern, to act as a gatekeeper to arbitration and strongarm a surety, like [Fidelity], into accepting onerous preconditions to arbitration, or else risk a default award that can be conclusively used against the surety."[54]

Addressing Fidelity's notice and opportunity to participate in arbitration, Eastern relies upon an internal memo from a Fidelity claim handler, written immediately after Eastern filed for arbitration against Ionadi, that "[Fidelity] may be bound" by the award, but to "hold off" on filing an answer to the demand.[55] Thereafter, Eastern claims, it repeatedly wrote to Fidelity asking it to participate in arbitration. Although Fidelity places great weight on the idea that Eastern imposed onerous and unacceptable conditions upon Fidelity's participation, Eastern attaches to its brief multiple letters and emails that make clear that Eastern directly sought Fidelity's participation, with no mention of any

---

[53] Brief of Fidelity as Designated Appellee at 59.

[54] *Id*.

[55] Ex. 1 to Brief in Support of Motion for Reconsideration of the Court's Opinion and Order Entered on December 10, 2018; Ex. A-1 to Second Brief of Eastern as Designated Appellant (emphasis added).

conditions. Eastern maintains that Fidelity "had the unconditional right at all times to participate in the arbitration with Eastern."[56]

In any event, even if Eastern somehow thwarted Fidelity's participation in the arbitration, Eastern highlights that Fidelity never sought to vacate the arbitration award; that Fidelity attended the hearings on Ionadi's bankruptcy but never objected to Eastern's actions; and that Fidelity attended all proceedings when Eastern sought to confirm the award in the Court of Common Pleas, yet did not seek to vacate the award and did not appeal the judgment. Thus, even if Fidelity had objections to arbitration, it did not seek to vindicate them at the time.

As for the enforceability of the award more generally, Eastern emphasizes Fidelity's joint and several liability with Ionadi, and the well-settled proposition that a surety's liability is co-extensive with that of its principal.

Eastern notes that the trial court's jury instructions explained this proposition, and Fidelity declined to object to the trial court's statement of the law *vis-à-vis* a surety's obligations. Eastern relies upon *Conneaut Lake*, which it contends is directly on point, and makes clear that the surety's opportunity to participate in arbitration is dispositive of the award's enforceability against the surety. Eastern also addresses Fidelity's attempt to distinguish *Conneaut Lake* because it involved a performance bond, rather than the payment bond at issue here. Eastern argues that this is a distinction without a difference because, either way, the bond assures performance of contractual obligations—whether performance of the work or performance of the payment obligations. Eastern contends that this understanding of *Conneaut Lake* is consistent with numerous federal court decisions applying Pennsylvania law, as well as the law of other states.

---

[56]     Second Brief of Eastern as Designated Appellant at 3.

We begin our analysis with an examination of the payment bond between Fidelity as surety and Ionadi as contractor. To secure Ionadi's solvency as contractor on the construction project, Fidelity issued a surety bond providing that Ionadi and Fidelity, "jointly and severally, bind themselves. . . to pay for labor, materials and equipment furnished for use in the performance of" the construction contract.[57] The payment bond did not concern only rights and obligations with respect to PSU; it also provided for Ionadi's and Fidelity's liability to subcontractors or, in the language of the payment bond, claimants. The payment bond is very clear in encompassing Ionadi's obligations to subcontractors such as Eastern to whom Fidelity shares liability for "all sums due."[58] Fidelity voluntarily assumed the obligation to stand jointly and severally liable to subcontractors in exchange for the premiums paid to Fidelity on the payment bond.

The payment bond was specifically to ensure that if Ionadi became insolvent, Fidelity would be there, jointly and severally liable for Ionadi's obligations. Eastern relied upon Ionadi's solvency and Fidelity's joint and several liability for Ionadi's debts when it entered into the Subcontract with Ionadi. In its Subcontract with Eastern, Ionadi specifically agreed to arbitrate any disputes arising out of the Subcontract. When Ionadi's breach of the Subcontract cost Eastern more than a quarter-million dollars' worth of work, Eastern followed the terms of the Subcontract, suing Ionadi in the only forum established therein. Under the terms of the Subcontract, Eastern was required to take its claims to arbitration, as both Eastern and Ionadi intended.

Given the plain text of the payment bond (and, indeed, the very nature of surety relationships), Fidelity had every reason to expect that it would be responsible in the event that Ionadi breached the Subcontract. Eastern provided Fidelity with notice that it was

---

[57]    Payment Bond, 10/29/08, at 5, ¶ 1; R.R. at 35a.

[58]    *Id*. at 5, ¶¶ 2.1, 3; R.R. at 35a.

making a claim under the Payment Bond. And Fidelity had every reason to know that the details of the breach and the extent of damages were issues that would be resolved in arbitration under the Subcontract for which it had agreed to be jointly and severally responsible. Fidelity chose to take on this obligation and then chose to disregard the arbitration proceedings that would determine the extent of Ionadi's obligation, for which Fidelity unambiguously shares liability.

"The obligation of the surety [is] coextensive with that of his principal."[59] By making Ionadi and Fidelity jointly and severally liable for "all labor, materials and equipment" to be used in the construction project, the payment bond established that any subcontractor claiming entitlement to payment from Ionadi could pursue that payment from Fidelity. The payment bond relieves Fidelity of this obligation only if and when Ionadi pays "all sums due" the Claimant. This phrase—"all sums due"—is undefined in the payment bond. The place to look to ascertain what sums may be due to a particular Claimant is the subcontract between that Claimant and Ionadi. Eastern's Subcontract with Ionadi provided for mandatory arbitration to resolve disputes as to sums owed. The terms of the Subcontract govern how Eastern was to be compensated for Ionadi's breach. That amount is the "sum due" under the payment bond.

Nor is Fidelity relieved of its obligations by the payment bond's designation of a court of competent jurisdiction to resolve disputes under the payment bond or by the fact that it was not a party to the Subcontract. Fidelity was on notice of the arbitration proceedings and declined to participate. If Fidelity believed that it could not be bound by the arbitration proceedings, or that only a court of competent jurisdiction could adjudicate it or Ionadi's liability to Eastern, it was not without options. Fidelity could have, for example, challenged the arbitrator's jurisdiction or sought to remove the case from

---

[59] *White v. Commonwealth*, 39 Pa. 167, 176 (Pa. 1861).

arbitration by asserting that it had to be brought in a court of competent jurisdiction. Instead, Fidelity did nothing, waiving any possible objections it may have had to the arbitrator's ability to resolve the question of Ionadi's and, therefore, Fidelity's obligations to Eastern.

Moreover, when Fidelity failed to pursue its right to participate in arbitration and further failed to honor its obligation to stand jointly and severally liable for Ionadi's debt, Eastern sued Fidelity in a court of competent jurisdiction under the terms of the payment bond. Eastern pursued Ionadi in arbitration under the Subcontract, and pursued Fidelity in a court of competent jurisdiction under the payment bond. In both instances, Fidelity received exactly that for which it and its principal had contracted.

Fidelity highlights the fact that sureties have an indemnification right against their principal.[60] If Fidelity must make payments to Claimants in accord with the payment bond, then Fidelity has the right to sue Ionadi for the shortfall. It may be that Ionadi's bankruptcy means that it is not in a position to satisfy whatever claims Fidelity may have against it. This is precisely the risk that Fidelity accepted when it issued the payment bond in exchange for premiums. Unlike Fidelity, Eastern never agreed to assume the risk of Ionadi's default or insolvency. Eastern agreed to perform work, for which it is entitled to be paid or to receive remedies available under its Subcontract.

The question of the enforceability of the arbitration award against Fidelity is answered by our precedent in *Conneaut Lake*. There, an arbitration award against a surety's principal was enforced against the surety, even though neither the surety nor the principal defended against the claim. With regard to the surety, we stated:

---

[60] *See, e.g., Reginella Constr. Co. v. Travelers Casualty and Surety Co.*, 949 F.Supp.2d 599, 612 (W.D. Pa. 2013) ("[T]he principal must usually agree to indemnify the surety if claims are filed. . . .").

The award was conclusive and binding upon it. The [surety] was notified of the time and place of [the] hearing before the arbitrator. It did not, apparently, see fit to appear and defend when it had the opportunity to be heard. It is not now in a position to raise questions which if they had any merit should have been raised by its principals, the contractors, and which were clearly within the jurisdiction of the arbitrator chosen by the parties to the contract to decide all matters of difference between them connected in any way with the work.[61]

This proposition of law is clear. If a surety had notice and declined the opportunity to participate in the arbitration proceedings in order to defend its interests, it cannot complain when an award is entered against its principal.[62]

Fidelity claims that *Conneaut Lake* implicitly was overruled when we stated in *Lincoln University v. Lincoln University Chapter of American Association of Professors* that "arbitration is a matter of contract, and, absent an agreement between the parties to arbitrate an issue, the parties cannot be compelled to arbitrate that issue."[63] This uncontroversial statement did not overrule *Conneaut Lake*, which did not contemplate forcing anyone to arbitrate an issue against their will.

Likewise, Fidelity was not forced to participate in an arbitration proceeding—it will simply have to bear the consequences of its decision not to. And no one is forcing anyone into arbitration absent an agreement to do so. Eastern and Ionadi had an agreement to arbitrate disputes arising out of the Subcontract. After Ionadi's breach, Eastern followed the terms of its Subcontract with Ionadi, which required Eastern to take its claims to arbitration. Under the payment bond, Fidelity is jointly and severally liable for Ionadi's debts to subcontractors like Eastern, an obligation that Fidelity voluntarily assumed in

---

[61]    *Conneaut Lake*, 74 A. at 622.

[62]    We reject Fidelity's argument that *Conneaut Lake* is distinguishable because it was a performance bond, not a payment bond. This is a distinction without a difference. Whether a performance bond or a payment bond, the surety bond assures performance of contractual obligations.

[63]    354 A.2d 567, 580 (Pa. 1976) (internal quotation omitted).

exchange for the premiums paid for the payment bond. Fidelity was aware that it would be responsible, jointly and severally, for Ionadi's breach of the Subcontract. Fidelity also had every reason to know that the details of that breach and the extent of the damages were issues that would be resolved in arbitration. Fidelity chose not to participate in arbitration. It then sought to challenge the results of that proceeding as unjust and prejudicial to its interests.[64]

The thrust of Fidelity's argument about the enforceability of the arbitration award centers around its suggestion that it did not have an opportunity to defend itself during

---

[64] In his Concurring and Dissenting Opinion ("CDO"), Justice Brobson takes a different view, as he does not agree that the arbitration award is conclusive and binding against Fidelity. Upon examination of the clear terms of the payment bond and the circumstances attendant to its execution, the CDO discerns no evidence of an intent to bind Fidelity to pay an arbitration award against Ionadi nor to require Fidelity to engage in arbitration with Eastern. The CDO deems significant the fact that the payment bond required any suit under the payment bond to be brought "in a court of competent jurisdiction." (Payment bond, 10/29/2008 at 5, ¶ 11). The CDO also emphasizes that Fidelity was not a party to the Subcontract, and stresses that the payment bond did not specifically identify or incorporate by reference the Subcontract.

The parties' intent to bind Fidelity to pay the arbitration award is evident in the fact that Fidelity voluntarily assumed the obligation to stand jointly and severally liable to subcontractors in exchange for the premiums paid to Fidelity under the payment bond. Given the plain text of the payment bond and the *sine qua non* of the surety relationship, Fidelity voluntarily assumed the obligation to be responsible for Ionadi's debts to Claimants in the event that Ionadi breached its subcontracts.

The payment bond's failure to mention or to incorporate by reference the subcontract, which was entered subsequent to the payment bond, means nothing. The payment bond encompasses Ionadi's obligations to subcontractors such as Eastern, whom the payment bond identified and defined as "Claimants," and to whom Fidelity shares liability for "all sums due." This plainly contemplates future subcontracts.

As detailed above, Eastern honored the payment bond's requirement to bring suit in a court of competent jurisdiction when it sued Fidelity in such a court under the payment bond, just as it honored the Subcontract's arbitration requirement when it pursued Ionadi in arbitration. It is unclear what the CDO believes Eastern ought to have done in order to hold Fidelity to its obligations under the payment bond, given that the CDO apparently views the arbitration proceeding against Ionadi as an exercise in futility.

the arbitration proceedings. Fidelity claims that Eastern imposed onerous conditions upon its entry into the arbitration proceedings that precluded its participation. However, the letter that Fidelity attaches to its brief in support of this position concerns Eastern's *consolidation* with Tinney Rebar Services' arbitration claim against Ionadi. This letter was dated April 14, 2011. In it, Eastern indicated that it would not object to consolidation of the arbitration proceedings if all parties agreed to certain conditions, the most objectionable to Fidelity being that "all parties will have to agree that Eastern Steel will be permitted to assert and pursue all claims which it has against [Fidelity] as part of the arbitration," and that Eastern can take "such written discovery and depositions as are necessary from [Fidelity's] representatives in respect to Eastern Steel's claims for bad faith and/or other causes of action."[65]

Although Fidelity now claims that these conditions were completely unacceptable, and that Eastern was using these bullying tactics to "gatekeep" its access to arbitration, this position is undermined by further communication between the parties. For example, two months after the April 14, 2011 "conditions" letter, on June 16, 2011 the President of Eastern wrote in a letter to Fidelity:

> My surety consultant has suggested this final offer to you. As you know, your principal contractor, Pat Ionadi, to which you have bonded with as insurer, still owes Eastern Steel substantial money as principal contractor. Also, you are well aware that the debts and duties after substantial time and delay have only been partially paid to Eastern Steel and as such the contract between your bonded principal and Eastern sets forth arbitration is the venue to cause judicial conclusion as to primary continuing contract debts still due Eastern from your principal. *Therefore, you certainly are invited to adjoin the arbitration yourself, and certainly are encouraged to do so*, even though your attorney would stay in close connection with your principal's attorney, which can be the same attorney.
>
> Point being, even though your attendance in the arbitration is as law holds, and if you want to have any particular agent there, you can. We hope you

---

[65] Ex. E-3 to Brief of Fidelity as Designated Appellee.

will reconsider such waste of resources, and pay and settle with Eastern Steel at this time, rather than continuing the charades that has [*sic*] cost Eastern Steel dearly.[66]

Unlike the conditions letter, this letter directly concerned Fidelity's participation in arbitration rather than the question of consolidation with Tinney. And Eastern directly invited Fidelity to participate in the arbitration proceedings. Indeed, Eastern encouraged it to do so, and it imposed no conditions whatsoever.

On July 8, 2011 (three months after the "conditions" letter), Eastern's counsel wrote the following email to Ionadi's counsel:

> Eastern has no objection to combining the Tinney/Ionadi claims in the same arbitration proceeding with Eastern's claims against Ionadi. Please advise us how AAA will apportion the costs of the arbitration between the parties
>
> . . .
>
> In addition, it is our understanding that the decision of Tinney and Ionadi to join these new claims is related to a pending lawsuit (in which Ionadi sought to dismiss Tinney's claims, asserting that they were required to be arbitrated), and that Ionadi's insurance company [Fidelity] is a party to that action. *Eastern offered [Fidelity] an opportunity to join this arbitration proceeding (since Eastern also has claims against [Fidelity] arising from its failure to pay Eastern the amounts due from its Principal, Ionadi), but [Fidelity] has refused to do so. To foreclose any claim of prejudice by [Fidelity] for not being included in this arbitration, as a condition of AAA's approval of the proposed joinder, AAA should require Ionadi to advise [Fidelity] in writing of the proposed joinder, and the opportunity for it to elect to participate directly in the arbitration (if it so chooses).*[67]

Like the prior letter, this letter did not demand concessions or impose conditions on Fidelity's participation. Rather, Eastern unconditionally sought to include Fidelity in the proceedings.

---

[66] Ex. 2 to Brief in Support of Motion for Reconsideration of the Court's Opinion and Order Entered on December 10, 2018; Ex. A-2 to Second Brief of Eastern as Designated Appellant.

[67] Ex. 4 to Brief in Support of Motion for Reconsideration of the Court's Opinion and Order Entered on December 10, 2018; Ex. A-3 to Second Brief of Eastern as Designated Appellant (emphasis added).

Eastern made this even more clear in a letter dated September 22, 2011 (five months after the "conditions" letter). A consultant for Eastern wrote to Fidelity:

Today, September 22, 2011, we have been informed that your principal is not, or can not [*sic*] pay the A.A.A. (American Arbitration Association) for its' contract duty share as to the scheduled Arbitration, and there are other problems [as] you are well aware, as the co-obligor insurance company who underwrote the surety protection.

There have been continuing defaults of your principal of not even giving Eastern Steel documents promised, as to each of their billings and payments by the project owner to which all of such in connection to the reinforcing steel installation was not being paid to Eastern, which we are sure you are aware.

*Beyond the above, is your insurance company going to step in now as to the arbitration, since you are co-extensive, on these contract duties of your principal?*[68]

As is evident in this correspondence, five months after the conditions letter, Eastern was growing increasingly annoyed by Fidelity's refusal to participate in arbitration despite repeated, condition-free invitations to do so. In light of these communications, all of which postdate the conditions letter (which itself was directed solely at consolidation), Fidelity's argument that Eastern imposed onerous conditions upon Fidelity's participation in arbitration is unpersuasive.

In its opinion granting Fidelity's motion to preclude evidence of the arbitration award, the trial court wrote in a single sentence that Eastern "urges that [Fidelity] was on notice that the arbitration was to be conducted, but there were conditions and restrictions placed on [Fidelity] that inclined [Fidelity] to not participate."[69] The record does not support the trial court's understanding of these communications. The conditions letter

---

[68] Ex. 2 to Brief in Support of Motion for Reconsideration of the Court's Opinion and Order Entered on December 10, 2018; Ex. A-2 to Second Brief of Eastern as Designated Appellant (emphasis added).

[69] Trial Ct. Op., 3/9/2015, at 1-2.

was related to the Tinney consolidation, not to Fidelity's participation in the arbitration proceedings. And the subsequent correspondence establishes that Eastern repeatedly sought Fidelity's participation without any conditions whatsoever.

Nor is it plausible to suggest that, had Eastern wished, it had the power or authority unilaterally to exclude an interested party like Fidelity, which was jointly and severally liable for the debts pursued, from participating in arbitration. The AAA's Construction Industry Arbitration Rules address consolidation or joinder in Rule R-7, which provides that a party wishing to join an ongoing arbitration has the right to request such joinder.[70] Even if Eastern's requested conditions associated with the Tinney consolidation somehow served to bar Fidelity from the arbitration proceeding as Fidelity now asserts, Fidelity could have ignored these conditions and sought joinder directly from the arbitrator. Fidelity would have had a compelling argument for joinder, as it is jointly and severally liable for Ionadi's debt to Eastern and would be prejudiced if not permitted to participate. But, of course, Fidelity was permitted to participate; it was specifically invited to do so.

*Conneaut Lake* held that the arbitration award is "conclusive and binding" if the surety had a fair opportunity to defend itself and protect its interests. Fidelity had such an opportunity and chose to forego it. The arbitration award entered against Ionadi is conclusive and binding upon Fidelity, which had every opportunity to defend against Eastern's claims, as a surety jointly and severally liable with Ionadi.

### C. Attorneys' Fees and Interest

We now turn to the question of whether a surety is liable for attorneys' fees and contractual interest under the terms of a payment bond that covers only labor, materials,

---

[70] AAA Construction Industry Arbitration Rules and Mediation Procedures, R-7(a)(ii) (2010).

and equipment. Although the Superior Court concluded that Fidelity is not liable for Eastern's attorneys' fees for pursuing Fidelity in court, it found that Fidelity was liable for Eastern's fees expended in pursuing Ionadi under the Subcontract. And although the Superior Court declined to give Eastern its preferred interest rate, it mandated an award of interest at the statutory rate of 6% per year. Fidelity challenges both rulings.

Reiterating that it was not a party to the Subcontract, Fidelity emphasizes that the payment bond's central obligation, in Section 1, was that Fidelity would be liable to pay only for "labor, materials and equipment" furnished for the construction contract. Fidelity argues that its obligation in Section 1 is null and void if Ionadi makes payment for "all sums due."[71] Fidelity argues that "all sums due" are only those necessary to pay for labor, materials, and equipment. According to Fidelity, there are no sums due beyond labor, materials, or equipment, such as attorneys' fees and interest. Fidelity argues that this result is confirmed by Pennsylvania's Mechanics' Lien Law of 1963,[72] as well as Pennsylvania precedent holding that labor, materials, or equipment does not include attorneys' fees or contractual interest.

Fidelity argues that the payment bond includes its own attorneys' fees provision, which is triggered only if Fidelity fails promptly to pay any undisputed amounts under the payment bond. Fidelity paid Eastern the undisputed amounts, while refusing to pay the amount disputed. Thus, Fidelity asserts that Eastern was not entitled to attorneys' fees under the payment bond.

Eastern contends that Fidelity's joint and several liability is to pay for "all sums due" Claimants. Eastern contends that this obligation tracks the language of the Mechanics' Lien Law and is designed to protect the property of PSU as owner from property liens.

---

[71]    Payment Bond, 10/29/08, at 5, ¶ 3; R.R. at 35a.

[72]    49 P.S. §§ 1101-1902.

Eastern argues that this language does not limit Fidelity's responsibility to pay Claimants "all sums due." As for the meaning of that phrase, Eastern emphasizes that the payment bond makes clear that Fidelity is not liable for obligations "that are unrelated to the Construction Contract."[73] Eastern contends that this language, by negative implication, imposes liability for debts that **are** related to the construction contract, which are, therefore, "all sums due."

Eastern maintains that its Subcontract with Ionadi provided for both attorneys' fees and a specified interest rate, and Fidelity's obligation to Eastern is defined by the Subcontract. According to Eastern, Fidelity stands in the shoes of Ionadi under the payment bond, and it thus owes Eastern every duty that Ionadi owed to Eastern under the Subcontract. Eastern asserts that its position is supported by *Fort Pitt Bridge Works*.[74] It is Eastern's position that Fidelity is liable for attorneys' fees and prejudgment interest under the Subcontract because the Subcontract defines the amount that Ionadi owes Eastern for labor, materials, and equipment.

The question of liability for attorneys' fees and interest is a matter of contract interpretation. Eastern contracted with Ionadi for the installation of steel reinforcing materials for the construction project. This was a contract for "labor, materials and equipment."[75] Ionadi did not pay Eastern in full. Under Section 3 of the payment bond, Fidelity's obligation to pay Ionadi's debts for labor, material, and equipment is discharged

---

[73] Payment Bond, 10/29/08, at 5, ¶ 9; R.R. at 35a.

[74] 240 A.2d at 494-95.

[75] Payment Bond, 10/29/2008, at 5, ¶ 1; R.R. 35a (providing that Ionadi and Fidelity "jointly and severally, bind themselves, their heirs, executors, administrators, successors and assigns to [PSU] to pay for labor, materials and equipment furnished for use in the performance of the Construction Contract").

only when Ionadi pays Eastern "all sums due."[76]  This contractual phrase—"all sums due"—refers to the sums that are due under the Subcontract.  Eastern did not get the benefit of its bargain under the Subcontract.  Under the payment bond, therefore, Fidelity is jointly and severally liable for this debt.

This analysis is supported by *Fort Pitt Bridge Works.*[77]  There, the contractor contracted to build a bridge.  The contractor obtained a surety bond that provided for joint and several liability to all subcontractors for material and labor for the project, and that also required the surety to pay "sums as may be justly due" the subcontractor.  The subcontractor delivered steel for the project, and the contractor defaulted on the payment.  The subcontractor sought payment from the surety.  The issue in *Fort Pitt Bridge Works* was when to start calculating interest against the surety.  The surety argued that, because it was only responsible for material and labor, it was not responsible for any interest accruing prior to notice of default.

This Court reasoned that, "at first blush, it might seem inequitable and harsh to compel the surety to pay for interest which had accrued prior to receiving notice that the principal . . . had defaulted in his payments, yet such was the obligation the surety had contracted to assume."[78]  The "surety is liable for interest from the time of the principal's defalcation."[79]  And the "interest was an integral part of [the principal's] debt for the material furnished, which material was unquestionably covered by the bond."[80]  Importantly, this Court stressed that: "The fact that the bond does not specifically refer to

---

[76]  Payment Bond, 10/29/08, at 5, ¶ 3; R.R. at 35a.

[77]  240 A.2d 494-95.

[78]  *Id*. at 494.

[79]  *Id*.

[80]  *Id*.

interest is not controlling; what [i]s controlling is that the surety has expressly agreed to make good the 'sum justly due' by the defaulting principal."[81] The Court added that, if the surety wished to protect itself, it could have done so by adding a notice provision to the surety bond.

The broad point that *Fort Pitt Bridge Works* made is that the "sums due" under a surety bond can be broader than the strictest possible reading of "material" and "labor"— the sums due are what the subcontractor bargained for under its subcontract for material and labor; that is "the obligation [that] the surety ha[s] contracted to assume."[82] As applied herein, every penny that Eastern spent to recover damages it sustained from Ionadi's breach of the Subcontract is a sum due for labor, materials, and equipment under the payment bond. The attorneys' fees and interest owed under the Subcontract are "an integral part" of Ionadi's debt for the material furnished, "which material was unquestionably covered by the bond."[83]

Fidelity acknowledges its right of indemnity against Ionadi. The very purpose of payment bonds is to protect others from the principal's default. The surety is obligated to pay the principal's debt. It then is free to seek recoupment of that loss directly from the principal. Either way, Eastern has a right to be paid for what it bargained for under the Subcontract.

The Superior Court correctly distinguished between attorneys' fees to which Eastern is entitled under the Subcontract, and attorneys' fees it incurred suing Fidelity in the trial court under the payment bond.[84] Fidelity is liable only for the attorneys' fees that

---

[81]     *Id*. at 494-95.

[82]     *Id*. at 494.

[83]     *Id*.

[84]     *Eastern Steel*, 282 A.3d at 856.

are due under the Subcontract and included in the arbitration award. Fidelity, as surety, is jointly and severally liable to Eastern for "all sums due" for Ionadi's breach. This is distinct from the attorneys' fees that Eastern accrued suing Fidelity under the payment bond in the trial court, and which are not covered under the Subcontract's terms.

With regard to prejudgment interest, the arbitration award included prejudgment interest at the elevated rate provided in the Subcontract (1.5% per month). That is distinct from interest that accrued while Eastern pursued Fidelity in the trial court to collect the arbitration award. Eastern sought recovery from Fidelity of the $433,489.42 awarded in arbitration. The Superior Court correctly rejected Eastern's claim that it is entitled to contractual interest under Paragraph 23 of the Subcontract, for the same reason that it held that Eastern was not entitled to attorneys' fees to enforce Fidelity's obligations under the Subcontract. "The payment terms of the [s]ubcontract may determine all sums due [to] Eastern from Ionadi for which [Fidelity], as surety, is jointly and severally liable, but the same cannot be said for interest due [to] Eastern to pursue collection of the arbitration award from [Fidelity] for breach of its surety obligations."[85] Rather, Fidelity's obligation for prejudgment interest is that provided for by statute.[86] Eastern received the benefit of its bargain for an interest rate under the Subcontract through arbitration.[87]

---

[85]    *Id*. at 858.

[86]    *See* 41 P.S. § 202 ("Reference in any law or document enacted or executed heretofore or hereafter to 'legal rate of interest' and reference in any document to an obligation to pay a sum of money 'with interest' without specification of the applicable rate shall be construed to refer to the rate of interest of six per cent per annum.").

[87]    In the CDO's view, the obligation under the payment bond to pay for labor, materials, or equipment does not require Fidelity to pay attorneys' fees or contractual interest. Under the payment bond, however, Fidelity's obligation to pay Ionadi's debts for labor, material, and equipment is discharged only when Ionadi pays Eastern all sums due—an amount that is determined by examining the sums due under the Subcontract. As Ionadi's surety, Fidelity is liable for the attorneys' fees and interest that are due under the Subcontract and included in the arbitration award.

Interest on Fidelity's debt under the payment bond, however, is distinct. Eastern's suit against Fidelity was to collect on the definite sum awarded against Ionadi in arbitration. Interest is recoverable on a definite sum from the time payment was due as a matter of right.[88] Because the arbitration award is conclusive and binding upon Fidelity, that award represents a definite sum, making interest recoverable from the time payment was due as a matter of right. As the Superior Court concluded, Eastern was entitled to be awarded prejudgment interest at the statutory rate of 6% per annum from the date of the arbitration award.[89]

To the extent that Fidelity and the CDO argue that the payment bond's specific attorneys' fees provision has any relevance in resolving this question, it does not. Sections 6.1 and 6.2 of the payment bond provide that, when a Claimant provides notice of a claim, Fidelity will (1) send an answer to the Claimant within sixty days "stating the amounts that are undisputed and the basis for challenging any amounts that are disputed;" and (2) "Pay or arrange for payment of any undisputed amounts."[90] Section 6.3 provides that:

> [Fidelity's] failure to discharge its obligations under this Section 6 shall not be deemed to constitute a waiver of defenses [Fidelity] or [Ionadi] may have or acquire as to a claim. However, if [Fidelity] fails to discharge its obligations under this Section 6, [Fidelity] shall indemnify the Claimant for

---

[88]  Restatement (Second) of Contracts § 354 (1981) ("(1) If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.").

[89]  For this reason, the Superior Court vacated the trial court's award of prejudgment interest and remanded for a proper determination of the prejudgment interest amount due.

[90]  Payment Bond, 10/29/2008, at 5, ¶¶ 6.1, 6.2; R.R. at 35a.

the reasonable attorney's fees the Claimant incurs to recover any sums found due and owing to the Claimant.[91]

Here, Fidelity sent an answer to Eastern within sixty days stating the amount that was not disputed and the basis for challenging the disputed amounts, and provided payment for the undisputed amount. Eastern makes no claim otherwise. The payment bond's attorneys' fee provision is not implicated herein. Contrary to Fidelity's argument, and notwithstanding the CDO's perspective, the Superior Court cannot be faulted for ignoring an irrelevant attorneys' fee provision.

We affirm the Superior Court's well-reasoned decision in all respects. Eastern's insurance bad faith claim under Section 8371 of the Judicial Code is not cognizable against Fidelity as surety. The arbitration award entered against Ionadi was admissible at trial, and conclusive and binding upon Fidelity. Eastern may recover as part of all sums due attorneys' fees incurred in connection with its action against Ionadi. Eastern also is entitled to prejudgment interest on the arbitration award at the statutory rate of 6% per year.

The order of the Superior Court is affirmed.

Chief Justice Todd and Justices Dougherty, Mundy and McCaffery join the opinion.

Justice Brobson files a concurring and dissenting opinion in which Justice Donohue joins.

---

[91] Payment Bond, 10/29/2008, at 6, ¶¶ 6.3; R.R. at 36a.